**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| KIMBERLY HUDSON, *individually, and on behalf of others similarly situated,*<br><br>*Plaintiff,*<br>v.<br><br>CYBERRISK ALLIANCE, LLC,<br><br>Serve registered agent at:<br>The Corporation Trust Company<br>Corporation Trust Center<br>1209 Orange Street<br>Wilmington, Delaware 19801<br><br>*Defendant.* | Case No.:<br><br><br><br>**Jury Trial Demanded**<br><br>**Class Action** |

## CLASS ACTION COMPLAINT

COMES NOW Plaintiff Kimberly Hudson ("Plaintiff"), individually, and on behalf of all others similarly situated, and for her Class Action Complaint against Defendant CyberRisk Alliance, LLC ("Defendant"), states:

## BACKGROUND

1. This case is about stopping incessant telemarketers like Defendant from placing unwanted and unsolicited text messages to the phones of Plaintiff and likely thousands of other persons.

2. Plaintiff brings this class action lawsuit against Defendant for placing improper telephone solicitation communications in violation of the Telephone

Consumer Protection Act, 47 U.S.C. § 227 *et seq*. ("TCPA"), and the TCPA's corresponding regulations.

3. In 1991, after passage with bipartisan support in Congress, President George H.W. Bush signed the TCPA into law, to protect consumers' consumers' privacy and the right to be left alone from unwanted telemarketing communications.

4. A leading sponsor of the TCPA described unwanted telemarketing communications as "the scourge of modern civilization." 137 Cong. Rec. 30821 (1991).

5. Defendant placed telephone solicitation communications to Plaintiff and the putative class members despite Plaintiff's and the putative class members phone numbers being registered on the National Do-Not-Call Registry ("DNC List").

6. Telemarketing communications are rampant in this country. As but one example, in the first nine months of 2025 alone, approximately 40.8 billion robocalls were placed in the United States. RobocallIndex.com, YouMail Robocall Index, https://robocallindex.com/history/time (last visited Oct. 21, 2025). The private right of enforcement of the TCPA is critical to stopping the proliferation of these unwanted telemarketing communications. For example, while the Federal Communications Commission levied over $200 million in penalties against telemarketers between 2015 and 2018, it collected less than $7,000 of that amount.

*See* Sarah Krouse, *The FCC Has Fined Robocallers $208 Million. It's Collected $6,790*, THE WALL STREET JOURNAL, March 28, 2019, https://www.wsj.com/articles/the-fcc-has-fined-robocallers-208-million-its-collected-6-790-11553770803.

7. Plaintiff seeks to represent putative class members who received two or more telephone solicitation communications within a 12-month period from or on behalf of Defendant after previously registering their numbers on the DNC List.

**PARTIES AND BACKGROUND ON THE PARTIES**

8. Plaintiff is an individual who resides in and is a citizen of the State of California.

9. Defendant is a Delaware limited liability company and has been in good standing to transact business in the State of New York and throughout the United States at all times material to this Complaint.

10. Defendant's principal place of business is in New York, New York.

11. Defendant's website is www.cyberriskalliance.com ("Defendant's website").

12. Defendant sells a variety of services relating to cyber security and online security matters.

13. One service Defendant sells is attendance to presentations/conferences it puts on about cybersecurity and online security topics.

14. Defendant markets these presentations/conferences on Defendant's website.

15. For example, one of Defendant's presentations/conferences is called "Identiverse." The price to attend "Identiverse" is identified by Defendant as ranging from $1,495 to $2,695 per attendee.

16. Another of Defendant's presentations/conferences is called "InfoSec World." The price to attend "InfoSec World" is identified as ranging from $3,095 to $4,195 per attendee.

17. Similarly, Defendant hosts various "Cybersecurity Summits" across the country in various cities, including but not limited to cities such as Atlanta, Georgia and New York, New York, and Defendant charges a fee for people to attend these "summits."

18. Defendant's website also markets Defendant's cyber security-related products (which are sold for a profit) such as a product called "CyberCept."

19. Defendant markets its products and services, in part, through telemarketing such as placing telemarketing text messages placed directly to consumers and/or having such calls placed on its behalf.

## JURISDICTION AND VENUE

20. This Court has subject-matter jurisdiction over the TCPA claims in this action under 28 U.S.C. § 1331, which grants this court original jurisdiction of all

civil actions arising under the laws of the United States. *See Mims v. Arrow Fin. Servs., LLC*, 565 U.S. 368, 386-87 (2012) (confirming that 28 U.S.C. § 1331 grants the United States district courts federal-question subject-matter jurisdiction to hear private civil suits under the TCPA).

21. This Court has jurisdiction over Defendant because, among other things, Defendant: had its principal place of business in New York, transacts business in New York, purposefully directed its marketing efforts to Plaintiff and the putative class members from New York, and otherwise has sufficient contacts with the State of New York.

22. For those reasons, and as set forth generally in this Complaint, this Court has personal jurisdiction over the parties to this action, and venue is proper pursuant to 28 U.S.C. §1391(b)(2).

**DEFENDANT'S TEXT MESSAGE TO PLAINTIFF AND OTHERS**

23. At all times relevant to this Complaint, Plaintiff was the owner of a phone bearing the phone number 661-XXX-2672.

24. Plaintiff's phone number was placed on the national Do Not Call Registry ("DNC List") on July 12, 2003, for the purpose of being left alone by telemarketers.

25. The account for Plaintiff's phone is held in her personal name, and not in the name of a business.

26. Plaintiff uses her phone primarily for personal and household purposes, including communicating with friends and family members.

27. Plaintiff did not inquire of Defendant's services or request Defendant's products and/or services.

28. Plaintiff was not in the market for Defendant's products and/or services.

29. Plaintiff did not provide Defendant or anyone acting on its behalf "prior express written consent" as that term is defined in 47 C.F.R. § 64.1200(f)(9) or any other form of consent to place calls to her.

30. Despite having her number long-registered on the DNC List, not consenting to receiving telemarketing communications (or any communications) from Defendant and not being in the market for Defendant's products and/or services, Defendant began sending text message telephone solicitations to Plaintiff's phone.

31. On August 26, 2024, Defendant or someone acting on Defendant's behalf, sent two text message telephone solicitations to Plaintiff's phone.

32. The first telephone solicitation was a text message that stated:

> Join us for FREE on 9/17 at the Atlanta Cybersecurity Summit. Gain the latest insight into the cyberthreats facing your business & network with your industry peers. Register using code: CSS24-TM at https://cybersecuritysummit.com/summit/atlanta24-sept/

33. The second telephone solicitation on August 26, 2024, was the following multimedia message:




34. The link in the first August 26, 2024, solicitation leads to a website for the event in Atlanta. The website states, in part, "This event is exclusively for professionals that would like to learn about the latest Cyber Security Solutions, Current Threats and **for those with the ability to influence & make purchasing decisions for their companies**." (emphasis added).

35. On September 4, 2024, Defendant or someone acting on Defendant's behalf, sent another two text message telephone solicitations to Plaintiff's phone.

36. The first telephone solicitation on September 4, 2024, was the following multimedia message:




37. The second telephone solicitation on September 4, 2024, stated:

> Join us for 50% OFF on 9/17 at the Atlanta Cybersecurity Summit. Gain the latest insight into the cyber threats facing your business and network with your industry peers. Register using code: CSS24-TM at https://cybersecuritysummit.com/summit/atlanta24-sept/

38. The link in the second September 4, 2024, solicitation leads to a website for the event in Atlanta. The website states, in part, "This event is exclusively for professionals that would like to learn about the latest Cyber Security Solutions, Current Threats and **for those with the ability to influence & make purchasing decisions for their companies**." (emphasis added).

39. On December 19, 2024, Defendant or someone acting on Defendant's behalf, sent another two text message telephone solicitations to Plaintiff's phone.

40. The first telephone solicitation on December 19, 2024, was the following multimedia message:




41. The second telephone solicitation on December 19, 2024, stated:

> Join us for FREE on 1/31 at the Atlanta Cybersecurity Summit. Gain the latest insight into the cyber threats facing your business and network with your industry peers. Register using code: CSS25-TM at https://cybersecuritysummit.com/summit/atlanta25-jan/

42. The link in the second December 19, 2024, solicitation leads to a website for the event in Atlanta. The website states, among other things, "Standard Admission: $250." The website further states, in part, "This event is exclusively for professionals that would like to learn about the latest Cyber Security Solutions, Current Threats and **for those with the ability to influence & make purchasing decisions for their companies**." (emphasis added).

43. Plaintiff responded to the second text message on December 19, 2024, by stating, on the same day, "stop."

44. In response to the "stop" request, Defendant responded by stating, "NETWORK MSG: You replied with the word 'stop' which blocks all texts sent from this phone number. Text back 'unstop' or 'start' to receive messages again."

45. Despite never requesting to receive text messages from or on behalf of Defendant in the first instance or requesting that she receive texts from Defendant after texting "stop," Defendant sent yet another text message to Plaintiff.

46. On February 28, 2025, Defendant or someone acting on its behalf sent Plaintiff a telephone solicitation text messages, that stated:

> Last chance to save up to $700 on your Identiverse 2025 pass! Early bird rates end tonight. Don't miss out: http://bit.ly/3XqOLUP

47. The text message sent to Plaintiff on February 28, 2025, appeared to have originated from area code 716, a New York area code.

48. The link in the February 28, 2025, text message takes the recipient to the website https://identiverse.com/?utm_source=marketing-campaign&utm_medium=audio&utm_campaign=identiverse-vegas-nevada-2025-june&utm_content=eb-last-chance.

49. The website offers for purchase tickets to attend Defendant's "Identiverse" conference/presentation.

50. The "Identiverse" website contains Defendant's logo and states that "Identiverse is "A CRA Resource."

51. The website in the link in the February 28, 2025, text message also contains a link to "Terms of Service." The "Terms of Service" links to Defendant's website and identify "CyberRisk Alliance, LLC a Delaware limited liability company."

52. On information and belief, each of the communications detailed in this Complaint were placed by or on behalf of Defendant as each of the communications identify Defendant, Defendant's products and/or services, and/or link to Defendant's websites.

53. On information and belief, it is likely that other consumers, like Plaintiff, also received a litany of unwanted and unsolicited telemarketing

communications from Defendant despite their phone numbers being registered on the DNC List.

54. On information and belief, the purpose of each of Defendant's communications to Plaintiff and the putative class members was to attempt to get Plaintiff and the putative class members to purchase Defendant's products and/or services.

55. Plaintiff and the putative class members did not provide Defendant "prior express written consent" as defined in 47 C.F.R. § 64.1200(f)(9) or any other form of consent to Defendant to send telephone solicitation messages to their phones.

56. On information and belief, Defendant knew or had reason to know that it should not place such telephone solicitation messages to Plaintiff and the putative class members yet incessantly placed such communications to them to sell its products and/or services.

57. The communications Defendant placed to Plaintiff and the putative class members were harassing, irritating, invasive and annoying.

58. Defendant's calls invaded Plaintiff's and the putative class members' right to privacy, namely the right to be left alone from unwanted telemarketing communications.

59. Defendant's calls caused Plaintiff and the putative class members to waste time and be disrupted from their daily activities, addressing and/or responding to the unwanted communications.

## DIRECT AND VICARIOUS LIABILITY

60. On May 9, 2013, the FCC determined that this was not a basis for avoiding liability within a Declaratory Ruling that held that sellers may not avoid liability by outsourcing telemarketing:

> [A]llowing the seller to avoid potential liability by outsourcing its telemarketing activities to unsupervised third parties would leave consumers in many cases without an effective remedy for telemarketing intrusions. This would particularly be so if the telemarketers were judgment proof, unidentifiable, or located outside of the United States, as is often the case. Even where third-party telemarketers are identifiable, solvent, and amenable to judgment limiting liability to the telemarketer that physically places the call would make enforcement in many cases substantially more expensive and less efficient, since consumers (or law enforcement agencies) would be required to sue each marketer separately in order to obtain relief. As the FTC noted, because "[s]ellers may have thousands of "independent" marketers, suing one or a few of them is unlikely to make a substantive difference for consumer privacy.

*In re: Dish Network, LLC,* 28 F.C.C. Rcd. 6574 at 6588 (May 9, 2013) (internal citations omitted).

61. Moreover, the May 2013 FCC ruling rejected a narrow view of TCPA liability, including the assertion that a seller's liability requires a finding of formal

actual agency and immediate direction and control over third parties who place a telemarketing call. *Id.* at 6587 n. 107.

62. The evidence of circumstances pointing to apparent authority on behalf of the telemarketer "should be sufficient to place upon the seller the burden of demonstrating that a reasonable consumer would not sensibly assume that the telemarketer was acting as the seller's authorized agent." *Id.,* at 6593.

63. If Defendant directly placed the telephone solicitation text and/or multimedia messages to Plaintiff and the putative class members, Defendant is directly liable for those communications.

64. However, Defendant may have hired, encouraged, permitted, and enjoyed the benefits of mass telemarketing by third parties who are unknown at this time as the only company identified in the communications to Plaintiff was Defendant.

65. To the extent a third party placed the communications at issue, such party or parties had actual and/or apparent authority to act on behalf of Defendant.

66. Likewise, Defendant may have also ratified a third party's violations of the TCPA by accepting leads and deriving profit from the improper telephone solicitations.

67. Defendant is not permitted under the law to outsource and contract its way out of liability by directing and benefiting from its agents' TCPA violations.

68. For the counts identified below, if Defendant directly placed the telephone solicitations at issue, it is directly liable. In the alternative, to the extent any such telephone solicitations were made by a third-party agent(s) acting on Defendant's behalf, Defendant can be held jointly and severally liable as Defendant is vicariously liable for those unlawful solicitations.

## CLASS ALLEGATIONS

69. Pursuant to Federal Rule of Civil Procedure 23(a), (b)(2) and (b)(3), Plaintiff brings this Complaint as a class action on behalf of herself, and all others similarly situated. This action satisfies the requirements of numerosity, commonality, typicality, and adequacy of representation.

70. Pursuant to Federal Rules of Civil Procedure 23(a), 23(b)(2) and 23(b)(3), Plaintiff seeks to represent the following class:

> **DNC List Class:** All persons in the United States who from four years prior to the date of the filing of this lawsuit until the date of class certification: (1) to whom Defendant (or someone acting on its behalf) placed two or more calls during a 12-month period; (2) where the calls were made for solicitation purposes, (3) whose number was registered on the DNC List for more than 31 days at the time the calls were placed; (4) where the phone number to which the calls were placed was registered to an individual, rather than a business.

71. Plaintiff reserves the right to add administrative subclasses, or to amend the definition of the proposed class, during the lawsuit proceedings.

72. The members of the proposed classes are so numerous that joinder of all members is impracticable. Plaintiff reasonably believes that hundreds or thousands of people have been harmed by Defendant's actions. The names and phone numbers of the members of the proposed classes are readily identifiable through records available to Defendant or those acting on its behalf.

73. Members of the proposed classes have suffered damages in an amount such that it would make filing separate lawsuits by individual members economically infeasible.

74. Common questions of law and fact exist as to all members of the proposed class and predominate over any questions affecting only individual members. The questions of law and fact common to the proposed class include, but are not limited to:

a. Whether the calls at issue qualify as "telephone solicitations" for the purposes of 47 U.S.C. § 227(c);

b. Whether Defendant's conduct violates 47 U.S.C. § 227(c) of the TCPA;

c. Whether an agency relationship exists between Defendant and anyone placing calls on its behalf;

d. Whether Defendant's manner and system of obtaining consumer "consent" was legally deficient;

e. Whether Defendant's conduct violates the rules and regulations implementing the TCPA; and

f. Whether Defendant and the putative class members are entitled to increased damages for each violation based on the willfulness of Defendant's conduct.

75. Plaintiff's claims are typical of the claims of the proposed class members because her claims arise from the same practice that gives rise to the claims of the members of the proposed classes and are based on the same legal theories.

76. Plaintiff and her counsel will fairly and adequately protect the interests of the members of the proposed classes. Plaintiff's interests do not conflict with the interests of the proposed classes she seeks to represent. Plaintiff has retained lawyers who are competent and experienced in consumer litigation, the TCPA and class actions.

77. Plaintiff's counsel will vigorously litigate this case as a class action, and Plaintiff and her counsel are aware of their responsibilities to the putative members of the classes and will discharge those duties.

78. A class action is superior to all alternative methods of adjudicating this controversy, including through individual lawsuits. Joinder of all proposed members of the proposed classes in one action is impracticable if not impossible and prosecuting hundreds or thousands of individual actions is not feasible. The size of the individual claims is likely not large enough to justify filing a separate action for each claim. For members of the proposed classes, a class action is the only procedural mechanism that will allow recovery. Even if members of the proposed

classes had the resources to pursue individual litigation, that method would be unduly burdensome to the courts. Individual litigation could also result in inconsistent adjudications.

79. In contrast, a class action is superior in that it will benefit the court and litigating parties through efficiency, economy of scale and unitary adjudication resulting from supervision of the litigation by a single court.

80. Questions of law and fact, particularly the propriety of placing calls to person on the DNC List and/or persons who should have been placed on Defendant's internal DNC List, predominate over questions affecting only individual members.

**COUNT I**
**Violations of the TCPA, 47 U.S.C. § 227(c) *et seq.***
**(National DNC List Violations – Individually, and on Behalf of The Putative Class)**

81. Plaintiff incorporates by reference the allegations of the previous paragraphs as if fully stated in this Count.

82. The TCPA provides that is a violation of the law for a person whose phone number is registered on the National Do Not Call Registry to receive more than one telephone solicitation on their phone "within any 12-month period by or on behalf of the same entity." *See* 47 U.S.C. §§ 227(c)(1), (c)(5); 47 C.F.R. § 64.1200(c)(ii).

83. The penalty for each telephone solicitation placed in violation of the TCPA's restrictions on placing calls to phone numbers registered on the DNC List

is up to $500 per call and up to $1,500 per call if the violation is determined to be willful. *See* 47 U.S.C. § 227(c)(5).

84. In addition, the TCPA allows the Court to enjoin Defendant's violations of the TCPA's regulations prohibiting phone calls to phone numbers registered on the DNC List. *See* 47 U.S.C. §§ 227(c)(5)(A).

85. By placing telephone solicitations to Plaintiff and the putative class members' phone numbers, which were registered on the DNC List, Defendant violated the TCPA, including, but not limited to, 47 U.S.C. § 227(c)(1) and/or the TCPA's corresponding regulations.

86. Defendant and/or those acting on their behalf knew or should have known that Plaintiff's and the putative class members' phone numbers were registered on the DNC List.

87. Defendant and/or those acting on their behalf willfully violated the TCPA when placing the telephone solicitations at issue to Plaintiff's and the putative class members' phones.

88. Plaintiff and the putative class members are entitled to damages of up to $500.00 per violation for each call placed by Defendant and/or those acting on their behalf that the Court finds violates the TCPA and up to $1,500.00 per violation if the Court finds that Defendant or those acting on its behalf willfully violated the TCPA.

## PRAYER FOR RELIEF

WHEREFORE Plaintiff Kimberly Hudson, individually, and on behalf of all others similarly situated, requests the Court enter judgment in her favor and against Defendant CyberRisk Alliance, LLC, and grant the following relief:

A. Enter an order against Defendant, pursuant to Federal Rule of Civil Procedure 23, certifying this action as a class action and appointing Plaintiff as the class representative;

B. Enter an order appointing counsel as class counsel;

C. Enter judgment in favor of Plaintiff and the DNC List Class members for all damages and other relief available under the TCPA, 47 U.S.C. § 227(c), including injunctive relief, statutory damages of $500 per violation, and up to $1,500 per violation if Defendant willfully violated the TCPA;

D. Enter a judgment in favor of Plaintiff and the Class that enjoins Defendant from violating the TCPA's provisions and regulations;

E. Enter judgment in favor of Plaintiff and the Class for all applicable pre-judgment and post-judgment interest amounts;

F. Enter judgment in favor of Plaintiff and the Class for all costs; and,

G. Award Plaintiff and the Class members such further and other relief the Court deems just and appropriate.

## DEMAND FOR JURY TRIAL

Please take notice that Plaintiff Kimberly Hudson demands a jury trial.

Respectfully Submitted,

KIMMEL & SILVERMAN PC

*/s/ Craig T. Kimmel*
Craig T. Kimmel, Esq.
Jacob U. Ginsburg, Esq. (*pro hac vice* anticipated)
30 E Butler Ave.
Ambler, PA 19002
(267) 468-5374
kimmel@creditlaw.com
jginsburg@creditlaw.com

BUTSCH ROBERTS & ASSOCIATES LLC

Christopher E. Roberts (*pro hac vice* anticipated)
7777 Bonhomme Avenue, Suite 1300
Clayton, MO 63105
Telephone: (314) 863-5700
croberts@butschroberts.com

THE WEITZ FIRM, LLC

Max Morgan, Esq. (*pro hac vice* anticipated)
1515 Market Street, Suite 1100
Philadelphia, PA 19102
(215) 901-8666
max.morgan@theweitzfirm.com
*Attorneys for Plaintiff*